## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KELLIE REGAN,

     *Plaintiff*,

                       CASE NO. 14-CV-14736

                       DISTRICT JUDGE ROBERT H. CLELAND

*v.*                       MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 11, 15)

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Regan is not disabled. Accordingly, **IT IS RECOMMENDED** that Regan's Motion for Summary Judgment (Doc. 11) be **DENIED** and that the Commissioner's Motion for Summary Judgment (Doc. 15) be **GRANTED**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. § 401 *et seq*. and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381–1385. (Doc. 2; Tr. 1-3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 11, 15).

Plaintiff Kellie Regan was thirty-four years old when she applied for benefits on January 3, 2012. (Tr. 146, 153). These applications were denied on June 14, 2012. (Tr. 53, 69). Regan requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ George Gaffaney on May 7, 2013. (Tr. 26-52). Regan, represented by attorney Nicole Winston, testified, as did vocational expert ("VE") Julie Svec. (*Id.*). On July 1, 2013, the ALJ issued a written decision in which he found Regan not disabled. (Tr. 11-17). On October 14, 2014, the Appeals Council denied review. (Tr. 1-3). Regan filed for judicial review of that final decision on December 16, 2014. (Doc. 1).

### B.     Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of

2

credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

3

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Regan not disabled under the Act. (Tr. 17). The ALJ found at Step One that Regan met the insured status requirements through December 31, 2015 and that she had not engaged in substantial gainful since the alleged onset date, November 5, 2011. (Tr. 13). At Step Two, the ALJ concluded that Regan had the following severe impairments: "history of L3-5 and L5-S1 fracture status post motor vehicle accident, [and] degenerative disc disease of the cervical spine." (*Id.*). At Step Three, the ALJ found that Regan's combination of impairments did not meet or equal one of the

4

listings in the regulations. (Tr. 13-14). The ALJ then found that Regan had the residual functional capacity ("RFC") to perform light work, except that Regan "can only occasionally climb stairs, stoop, balance, kneel, crouch or crawl. The claimant can never climb ladders, ropes, or scaffolding." (Tr. 14-16). At Step Four, the ALJ found that Regan was able to perform her past relevant work as a cashier, fast food worker, and laborer. (Tr. 16-17). As a result, the ALJ found Regan not disabled under the Act. (Tr. 17).

### E.    Administrative Record

#### 1.    Medical Evidence

The ALJ found that Regan does not suffer from any mental limitations, and Regan does not challenge this finding in her brief. (Tr. 13, Doc. 11 at 11-26). Consequently, the Court will not discuss Regan's medical records insofar as they relate to her mental limitations.

On November 6, 2011, Regan was admitted to the emergency room following a motor vehicle accident in which she was flung some distance from the vehicle. (Tr. 244). Regan was alert and cooperative, but grimaced in pain; her head appeared uninjured; she suffered from diffuse point tenderness throughout her thoracic and lumbar spine; a transverse abrasion on the superior abdominal wall; she had multiple abrasions on all four extremities; and decreased extension in the left extremity. (Tr. 245). Regan was admitted to the surgical unit for further evaluation, though surgery was not performed on that date. (Tr. 228, 246).

A CT scan of Regan's cervical spine showed generally normal results, with no evidence of a cervical spine fracture or subluxation, but did show signs of a nondisplaced fracture of the right second rib and a fracture spinous process T3. (Tr. 250). A CT scan of Regan's lumbar

spine showed multiple fractures of the transverse processes, predominant on the left side, a bilateral fracture to the L5 transverse process, fracture to the inferior endplate of L4 inferolaterally, fracture of the spinous process of the L3-4-5, fracture of the left twelfth rib, and edema hematoma in the soft tissue of the back suggesting interspinous ligamentous injury. (Tr. 249). A CT scan of the maxillofacial region showed no evidence of a fracture. (Tr. 235). A second CT scan of her thoracic and lumbar spine showed satisfactory alignment in the thoracic spine, with preserved body heights and disc space, nondisplaced fractures through the right second and third posterior ribs, multiple minimally displaced left sided rib fractures, fractures involving the T3 spinous process and left lamina as well as the left T10 transverse process, displaced fractures involving the left T12 rib and left-sided lumbar transverse process, a subtle fracture through the L4 endplate, possible fractures at the superior L1 articulating facet, a non-displaced fracture through the right L5 transverse process, displaced spinous process fractures involving the L3-L5 levels, preserved spinal alignment, and no osseous encroachment on the spinal canal. (Tr. 265). An x-ray of her chest showed a second rib fracture. (Tr. 231). A CT scan of Regan's head and cervical spine showed no acute fracture or dislocation in the cervical spine, and no mass effect, hemorrhage, or midline shift. (Tr. 266).

Regan was discharged on November 10, 2011, whereupon it was noted that Regan's condition "continued to improve," despite continued paralysis of her left hand secondary to brachial plexus injury. (Tr. 228).

On November 15, 2011, Regan treated with physician's assistant ("PA") Laural Wagley at Lighthouse Family Medicine. (Tr. 267-70). PA Wagley noted that Regan's neck was supple,

that she had a back brace in place, but showed no bruising, discoloration, or swelling, was using a walker, and reported some discomfort in her heels. (Tr. 268).

A December 1, 2011, CT scan of Regan's thoracic and lumbar spine showed "essentially stable thoracic and lumbar fractures without evidence for instability," along with "improving but persistent areas of hematoma." (Tr. 272).

On December 2, 2011, Regan again treated with PA Wagley, who diagnosed the closed fracture of an unspecified part of the vertebral column, and prescribed Baclofen for treatment of muscle spasms. (Tr. 273-75).

On December 19, 2011, Regan visited D.O. E. Neil Pasia for treatment of hip and back pain. (Tr. 252-54). Regan was at that time taking Lortab and Motrin for pain relief, and suffered from pain in the mid and lower back, along with radiating pain into the left hip area. (Tr. 252). Regan stated that Baclofen provided no relief. (*Id*.). She further reported "some issues with her left arm." (*Id*.). Regan showed tenderness to palpation over the midline of the thoracic and lumbar spine and the iliac crest. (*Id*.). She further showed some paravertebral spasm, and the motion of her lumbar spine was limited to ten degrees of flexion. (*Id*.). She did not experience pain on the rotation of her hips, and walked "gingerly side bent to the left." (*Id*.). Regan's grip strength was 3/5 in the upper left extremity. (*Id*.). X-rays of Regan's spine showed spastic curvature of her thoracic spine, and she appeared to have fractures at T3, T10, and T12. (*Id*.). D.O. Pasia diagnosed second and third rib fractures on the right side; T3, T10, T12, L3 and L5 spinous process fracture; L4 end plate fracture; low back pain; and thoracic

pain. (*Id.*). D.O. Pasia noted that surgical intervention may be necessary, recommended physical therapy, and prescribed the painkillers Norco and Valium. (Tr. 254).

Regan again treated with D.O. Pasia on January 27, 2012. (Tr. 256-57). He noted that Regan "continued to have pain about her back," that she "has significant functional limits due to these symptoms," including difficulty moving from sitting to standing, experienced increased swelling, had been pursuing physical therapy, and "has fallen a couple of times." (Tr. 256). She continued to experience tenderness about the midline of her spine, moved "gingerly," the flexion of her spine was limited to thirty degrees, and she could walk on heel and toe. (Tr. 256). X-rays of Regan's spine showed curvature due to spasm and listhesis at L5/S1. (Tr. 256-57). Regan did not have "significant radiculopathy at this point," but her "spondylolisthesis at L5/S1 [was] traumatic." (Tr. 257). D.O. Pasia noted that Regan continued to have "a great deal of low back pain and spasms with soft tissue strain," and again noted that she may be a candidate for surgery. (*Id.*).

In February 2012 Regan underwent an electrodiagnosis study at the hands of Dr. Dowden, who noted unremarkable findings with regard to the bilateral median and ulnar nerve condition studies, but that the findings were "compatible with a left C8 radiculopathy rather than brachial plexopathy." (Tr. 259, 280). On March 16, 2012, Dr. Dowden noted that Regan was "doing okay," and was wearing a back brace only part of the time because it did not help with pain. (Tr. 281). Regan reported headaches, irregular heartbeat, some tingling and numbness in the left arm; Dr. Dowden prescribed an increased dose of Ibuprofen to treat back pain. (Tr. 281-82).

On February 28, 2012, Regan was examined by consultative physician Dr. Devprakash Samuel. (Tr. 260-61). Regan reported that she experienced significant weakness in her left hand following her discharge from the hospital, but "over the last three months, noted about a 70 percent improvement, but she still has weakness in the handgrip of the left hand and is also unable to lift heavy objects." (Tr. 260). Regan's gait and station were normal, Roberg test was negative (indicating normal balance while walking), no abnormal muscle movements were noted, her coordination was normal, and muscle tone was normal. (Tr. 261). However, Regan had left arm and hand weakness, rated at 3+ out of 5 in both the hand muscles and triceps. (*Id.*). Dr. Samuel recommended that Regan "begin a more extensive physical therapy program . . . for a left C8 radiculopathy. She should work on strengthening exercises." (Tr. 262).

On March 27, 2012, D.O. Pasia noted that Regan moved "quite gingerly," but had no significant tenderness to palpation; the motion of her lumbar spine was limited to fifty degrees in flexion and to neutral on extension. (Tr. 286). X-rays of her spine showed spondylolisthesis at L5/S1, which "seem[ed] to be slightly increased listhesis as compared with the prior December films," along with subtle curvature throughout the thoracolumbar area, "likely due to spasm and position." (*Id.*). D.O. Pasia suggested that the best treatment option was surgical stabilization through posterior lumbar decompression, with fusion at L5/S1 and transforaminal lumbar interbody fusion, but also noted that surgery "may not alleviate symptomatology." (Tr. 287). Finally, he noted that Regan "is to remain off work; anticipate she will be off work three to six months post operatively." (Tr. 288).

9

An April 4, 2012, MRI of Regan's spine showed "[h]ypertrophic changes throughout the posterior facets with slight diminished signal of the L5-S1 disc space indicating some partial dessication of the disc" along with circumferential bulges of the annulus fibrosis at L4-L5 and L5-S1. (Tr. 285).

On April 10, 2012, Regan again treated with D.O. Pasia, who noted complaints of thigh pain, and increased pain and tenderness in the low back. (Tr. 283). Examination of the back showed no tenderness to palpation over the midline of the spine, but with some paravertebral spasms; flexion of the lumbar spine was forty degrees, and extension went to zero degrees. (*Id*.). D.O. Pasia diagnosed "severe low back pain," isolated uses at L5/S1, and dynamic listhesis. (Tr. 284). He noted that surgical stabilization was the best method to treat the listhesis, and that further conservative therapy would not treat her instability. (*Id*.).

On May 8, 2012, Regan once again treated with D.O. Pasia, who noted that Regan was scheduled to undergo surgery on May 23, 2012, and that she continued to have sharp pain in her low back, particularly when bending, resulting in some functional limitations. (Tr. 291). Regan was then experiencing "significant paravertebral spasm," motion of her lumbar spine was limited to forty degrees in flexion and zero degrees in extension. (*Id*.). Regan was noted to have "persistent worsening of her symptoms," which "can have improvement with surgery." (Tr. 292). D.O. Pasia also found that Regan would likely need to be off work for three to six months post-operatively. (*Id*.).

Regan underwent surgery on May 23, 2012, at Port Huron Hospital. (Tr. 294-97). Regan underwent a nine-step procedure for the treatment of her spinal issues; her preoperative and

10

postoperative diagnoses were identical, including traumatic spondylolisthesis L5-S1, pars and pedicle fracture and spinous process fracture L5, spinous process fracture L4, and transverse process fracture L5. (Tr. 294). Four screws, two rods, one cross-link and one cornerstone cage were implanted into Regan's spine. (Tr. 295). The surgical notes are extremely thorough in terms of the procedures performed, but offer little insight into Regan's prospects for recovery. (Tr. 294-97).

On June 12, 2012, Regan again treated with D.O. Pasia, this time for a recheck following her back surgery. (Tr. 298-99). X-rays of her spine showed that the fusion was maintained, and listhesis was "well reduced." (Tr. 298). Regan was found to be "doing very well with her surgery," and was "ambulating well." (Tr. 299).

Regan treated with Dr. Dowden on July 12, 2012. (Tr. 301-03). At the outset, Dr. Dowden noted that Regan "was denied disability through Social Security." (Tr. 301). On that date, Regan asserted that she was "still having left side/hip pain – was having before surgery, but didn't really go away after surgery – hurts more than back." (*Id*.). Regan complained of limited use of her left arm. (*Id*.).  Her spine was tender to palpation over the left iliac crest. (Tr. 302). Dr. Dowden's notes also reflect "5/5 right upper ext, right lower ext; 4/5 left int/ext shoulder rotation, and hip flex/ext, leg flex/ext," though the meaning of these notes is somewhat unclear. (*Id*.).

On July 24, 2012, D.O. Pasia noted that Regan was "continuing to make progress since her surgery," and she was recommended to pursue physical therapy. (Tr. 357). It was estimated

that she would be off work six months post-operatively. (*Id.*). Regan's spine showed "some tenderness over the anterior superior aspect. (Tr. 358).

On October 16, 2012, D.O. Pasia recorded that Regan was "walking a lot more," but continued to have low back pain. (Tr. 354). Regan complained of constant, significant spasms in her low back. (*Id.*). She also reported transportation issues, and was unable to attend physical therapy. (*Id.*). Regan's lumbar spine showed no tenderness to palpation over the midline, but did show paravertebral spasms. (Tr. 355).

On November 8, 2012, Dr. Dowden again noted that Regan was "doing okay." (Tr. 367). Regan complained that she was limited in performing certain exercises, and could "only walk right now;" her physical therapy was limited to massages at that time. (Tr. 368).

On December 18, 2012, Regan related to D.O. Pasia that "overall she [was] doing okay" despite continued lower back pain, stiffness in her back, and her back fatiguing easily. (Tr. 351). Regan also complained of neck pain and radiating pain and numbness in her upper left extremity, which had worsened over the last few months. (*Id.*). Regan's lumbar and cervical spine was non-tender to palpation over the midline, the flexion of her lumbar spine showed flexion to twenty degrees and extension to neutral, she had no pain on rotation of the hips, she had some paravertebral spasm at the base of the neck, and she had adequate range of motion. (Tr. 352). Regan also had weakness of grip in the upper left extremity. (*Id.*). D.O. Pasia found that Regan's "lumbar issues continue to improve slowly," and recommended that she continue with therapy; Regan continued to take Norco for pain and Baclofen to treat spasms. (*Id.*).

12

On January 18, 2013, D.O. Pasia found that Regan was "having some soreness at her low back but overall she is doing okay." (Tr. 348). Regan was "only taking occasional pain medications," and was performing back exercises as recommended, but "fe[lt] she still has some improvement to make." (*Id*.). Regan reported continuing numbness in her left arm, along with continued back pain and some spasms. (*Id*.). She experienced no pain on palpation of the lumbar or cervical spine, no pain in her hips on rotation, and had adequate range of motion in terms of flexion, extension, rotation, and bending. (Tr. 349). D.O. Pasia concluded that Regan's "lumbar spine is making steady progress but her neck and left upper extremity continue to give her significant symptoms," and recommended further imaging testing. (*Id*.).

On February 5, 2013, Regan underwent an MRI of her spine, which indicated a mild decrease at C3-C7, asymmetrical spondylosis narrowing of the medial aspect of the neuroforamen with uncinate spurring, with no disc protrusions, mild dextroconvex curvature in the cervical region, and was otherwise free of neural encroachment or disc protrusion. (Tr. 359).

On March 12, 2013, Regan again treated with D.O Pasia, complaining of continued numbness in her left hand, "some increased pain at her low back over the past week," and had been using a heating pad for relief. (Tr. 345). Regan was noted to have completed her physical therapy and was performing back exercises at home. (*Id*.). Further, Regan complained of "significant spasms" in her low back which occurred frequently. (*Id*.). D.O. Pasia found that Regan's spine was non-tender to palpation over the midline, but showed some paravertebral spasms. (Tr. 346). Regan's lumbar spine showed flexion to thirty degrees, and neutral

13

extension, and she had no pain on rotation of the hips. (*Id*.). Regan's cervical spine also showed no tenderness upon palpation at the midline, with some paravertebral spasms at the base of the neck, and an "adequate" range of motion in all directions. (*Id*.). Regan's motor strength in her upper left extremity was five out of five. (*Id*.). D.O. Pasia suggested that further therapy may provide some benefit. (*Id*.).

Also on March 12, 2013, Regan told nurse practitioner ("NP") Linda Esch that she would like to increase her dosage of a diet pill and noted that she was in physical therapy three days per week; no mention was made of her pain, pain medication dosages, or other matters related to her crash related injuries. (Tr. 364-66).

On April 9, 2013, N.P. Linda Esch noted that Regan was "more active when [her] back does not bother[] her." (Tr. 362). She was found to suffer "[n]o palpitations, nausea," and her assessment included discussion of only obesity and generalized anxiety disorder. (Tr. 362-63).

### 2.    Medical RFC Assessments

On July 19, 2012, approximately two months after her surgery, Regan visited with Dr. Dowden for a physical residual functional capacity ("RFC") assessment. (Tr. 325-29). Dr. Dowden asserted that he treated Regan for several years as her primary care provider. He found that Regan could walk one city block without rest or pain, sit for one hour, and stand for five minutes. (Tr. 326). Further, he noted that she could walk stand or walk for less than two hours in an eight-hour workday, could sit for about four hours in the same time period, but would require the ability to walk around for two minutes every fifty minutes. (*Id*.). Regan would also require the ability to shift positions at will, and would need to take unscheduled

breaks three to four times daily, for an average of five to ten minutes each. (Tr. 327). Dr. Dowden also opined that Regan could lift up to ten pounds frequently, but could never lift twenty or more pounds. (*Id*.). He expected that her symptoms would last at least twelve months, that her symptoms were consistent with her impairments, and found that Regan was not a malingerer. (Tr. 328). Regan's pain would often interfere with her attention and concentration. (*Id*.). She could never stoop or climb ladders, and could only rarely twist, crouch, or climb stairs. (Tr. 329). She was likely to have more than four bad days per month, though this may have been conditioned by a handwritten comment noting "when starts physical therapy." (*Id*.).

On September 19, 2012, David Skavdahl, a Disability Determination Service ("DDS") non-medical analyst reviewed Regan's record, finding "[a]bsent is medical evidence which refutes [the] medical source statement. Given age and recentness of L5-S1 surgery, a brief (less than 3 years) diary is indicated." (Tr. 336). On that same date, DDS medical consultant Dr. Bernard Stevens noted that Regan's medical records indicated that her condition had improved following surgery, and that Dr. Dowden's RFC analysis was "hypothetical and there was no basis [for it] from an objective standpoint, as the claimant was doing well postoperatively from a routine operation." (Tr. 337). Consequently, he concluded that Regan was capable of sedentary work, consistent with the rejection of her application for benefits on June 14, 2012. (*Id*.).

On April 22, 2013, N.P. Esch completed an RFC assessment. (Tr. 339-43). She asserted that Regan suffered pain with activity, including climbing stairs; that she could sit for one hour

15

and stand for five minutes without a break; and could sit for two hours and stand less than two hours in an eight-hour workday. (Tr. 339-41). Further, Regan would need to walk every forty-five minutes for about two minutes, would need to shift postural positions at will, take five to ten minute breaks three to four times daily, but would not need to elevate her legs. (Tr. 342). Regan could lift up to ten pounds frequently, but never lift more than that weight. (*Id*.). She could rarely twist, crouch, and climb stairs, but never stoop or climb ladders. (Tr. 343). Finally, she found that Regan would experience more than four "bad days" per month. (*Id*.).

### 3.    Application Reports and Administrative Hearing

#### a.    Regan's Function Report

On February 9, 2012, Regan completed a function report. (Tr. 191-98). On that date, Regan reported that she was unable to work because her back injuries prevented her from sitting or standing for long periods of time, limited her ability to walk and use her left hand, and caused constant pain. (Tr. 191). Regan described her average day as getting her kids ready for school, "try[ing] to watch T.V. for a while, try[ing] to walk around for a bit" and spending time with her family. (Tr. 192). Her hobbies included board games, watching television, horseshoes, bowling and snowmobiling.[1] (Tr. 195). She reported that her husband performed the cooking, cleaning, and driving. (Tr. 192). Regan asserted that her pain interrupted her sleep, limited her ability to put on her bra and shoes, style her hair, and shave her legs. (*Id*.). She prepared frozen meals and sandwiches a few times per week, and did not perform house or

---

[1] Regan later reported that because of her illness she "can't bowl, visit my friends, go shopping, or to movies." (Tr. 196). It thus appears that Regan listed her former hobbies rather than those in which she was still capable of participating.

yard work because of difficulty bending over and using her back. (Tr. 193-94). She was unable drive and needed help getting into vehicles. (Tr. 194). She shopped for food "when needed" for "not long" because of difficulty walking. (*Id*.). Regan asserted that she required accompaniment to visit stores and her doctor's office. (Tr. 195). Regan wrote that she was able to lift only five pounds, was unable to squat or bend, could stand or walk only for short periods of time, required assistance to kneel, and was unable to climb down long flights of stairs. (Tr. 196). She further reported being able to walk for ten minutes, and would require a ten minute rest before walking again. (*Id*.). In terms of mobility aids, Regan reported using a walker, wheelchair, and a back brace, which she used while shopping and at home. (Tr. 197). As to medication side effects, Regan stated that she experiences drowsiness. (Tr. 198).

On March 28, 2012, Regan completed a second function report. (Tr. 199-206). This report generally duplicates Regan's prior report, except insofar as she asserted that her hobbies included "bowling, horseshoe, playing with my children," but that she now "can't do any of those activities due to [her] back." (Tr. 203). Regan also limited her walking ability to "just a few min[utes]," and said that she would require "about 5 min[utes] of rest" before walking again. (Tr. 204).

Regan's husband completed a third party function report which generally confirmed the assertions made in her function report. (Tr. 183-90).

### b.    Regan's Testimony at the Administrative Hearing

At the May 7, 2013, hearing before the ALJ, Regan testified that she suffered from swelling and muscle spasms in her left flank. (Tr. 29). She suffered from lower and middle

17

back pain which traveled into her legs, particularly on the left side. (Tr. 33). Regan also asserted that she began experiencing additional spasms after the surgery, and that she experienced pain rating somewhere between six and eight out of ten on an average day, and a ten out of ten on a bad day. (Tr. 35). Regan testified to spending much of her time in a recliner, getting "[u]p and down" in an effort to alleviate pain. (*Id*.). Regan further testified that she has three to four "bad days" per week. (Tr. 36). Regan said she could sit for between ten minutes and an hour before switching postural positions. (Tr. 40-41). She asserted that she had not attempted to lift more than ten pounds, and would probably be unable to lift a gallon of milk on a frequent basis. (Tr. 41). Regan asserted that she elevates her legs six or seven times daily, though her attorney acknowledged that there was no support for this restriction in the medical evidence. (Tr. 43). Regan said that she was unable to use her left hand to tie shoes or a garbage bag, because of a dearth of strength. (Tr. 43-44). She asserted that her surgery did not ameliorate her left arm numbness. (Tr. 44). Regan also stated that she was unable to bend, but did not confirm that she was unable to squat, crawl, or climb. (*Id*.).

### d.    The VE's Testimony at the Administrative Hearing

The ALJ then asked the VE a series of hypothetical questions to determine whether Regan is capable of completing competitive, remunerative work. (Tr. 77). First, he asked the VE to assume a person of identical age, education, and vocational history to Regan, but who could lift "20 pounds occasionally and 10 frequently. Stand and sit six hours each in an eight-hour workday. The nonexertional, rather than constant or frequent, are just occasional. The stairs, stoop, balance, kneel, crouch and crawl." (Tr. 48). The VE determined that such a

worker could perform Regan's prior jobs of cashier, factory laborer, or fast food worker. (Tr. 48-49). In a second hypothetical, the ALJ added a restriction to lifting "ten pounds occasionally and five [pounds] frequently. Stand two hours in an eight-hour workday. Sit for six. The nonexertional all stay occasional." (Tr. 49). The VE found that these restrictions would eliminate all past work, but that such a person could still work as an assembler (12,000 jobs nationwide), document preparer (50,000 jobs), or order clerk (23,000 jobs), all of which have a specific vocational preparation ("SVP") of two. (*Id.*). In a third hypothetical, the ALJ added a restriction that Regan would miss three days of work per month; the VE testified that such a restriction would preclude competitive work. (Tr. 50).

Regan's attorney asked the VE whether a worker who is off task for twenty percent of the day could complete competitive work; the VE replied that a worker who is off task for greater than ten percent of the day would be unable to complete competitive work. (Tr. 50-51).

## F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the

19

Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive

20

effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a

21

claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL

374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . . pain;
(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

**G.    Analysis**

Regan argues that the ALJ erred in the following ways: 1) Failing to base the RFC on a physician's RFC assessment; 2) Drafting an RFC that is not supported by the medical evidence; 3) Failing to properly address the opinions rendered by Dr. Dowden, D.O. Pasia, N.P. Esch, and DDS analyst Skavdahl; and 4) Improperly impugning Regan's credibility. These arguments will be addressed in turn.

### 1.  *The ALJ Was Not Obligated to Base the RFC on a Physician's RFC Assessment*

Regan first argues that the ALJ erred by finding that she was capable of "light work," despite no physician having found that she was capable of such labor. (Tr. 14; Doc. 11 at 15). Regan asserts that, "[s]ince RFC is a medical assessment, an ALJ is precluded from making this assessment without some expert medical testimony or other medical evidence to support his decision . . . . [T]here are no medical opinions form [sic] any treating or record reviewing physicians to suggest that Mrs. Regan can function at the light level." (Doc. 11 at 12, 14).

The Commissioner is tasked with establishing a claimant's RFC "based on all of the relevant medical and other evidence." 20 C.F.R. § 416.945. However, the Commissioner is not obligated to base this RFC upon a physician's RFC, or upon any particular piece of evidence. "[T]o require the ALJ to base her RFC finding on a physician's opinion, would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (quotation omitted). As in *Rudd*, the ALJ may find that the claimant can perform light work even where no doctor

24

corroborates that assessment. *Id*. The ALJ was thus not obligated to draft an RFC assessment which comported with one drafted by a physician, and was instead entitled to create an RFC based on his evaluation of the available medical evidence.

### 2.  *The ALJ's RFC is Well Supported by Medical Evidence*

Next, Regan argues that the ALJ's finding that she could perform light work is not supported by substantial evidence in the medical record. (Doc. 11 at 12). A review of Regan's post-operative medical records supports the ALJ's characterization of the evidence. While Regan showed some tenderness over the spine in July 2012 (Tr. 302, 358), by January 2013 this tenderness was resolved (Tr. 349), and notes from March 2013 demonstrate that she experienced no further tenderness (Tr. 346). Regan reported some paravertebral spasms throughout her post-operative medical records (Tr. 346-54), but there is no evidence that these spasms were disabling. Regan reported significant hip and back pain in July 2012, October 2012, and December 2012 (Tr. 302, 351, 354), but by January 2013 was "only taking occasional pain medications" (Tr. 348). In March 2013, Regan complained of "some increased pain at her low back over the past several weeks," but the pain was sufficiently minor that she was able to treat it with use of a heating pad. (Tr. 345). Regan's final medical notes from March and April 2013 make little mention of her back pain, noting only that she was "more active when [her] back does not bother[] her." (Tr. 362-66). Likewise, Regan complained of weakness of the upper left extremity in December 2012 (Tr. 351-52) and January 2013 (Tr. 349), yet by March 2013 she had full strength in that extremity (Tr. 345). While Regan continued to complain of paresthesia of the left hand through March 2013, there is no

indication that this numbness would be disabling. (Tr. 345). The record thus does not demonstrate an "ongoing deterioration," as Regan suggests in her brief (Doc. 11 at 21), but rather seems to show consistent progress in terms of pain, strength, and mobility. The ALJ's RFC is thus well supported by medical evidence.

### 3. *The ALJ Properly Considered the Opinions of Regan's Physicians*

#### a. **Dr. Dowden**

Regan next argues that the ALJ did not properly consider the opinions of her physicians. (Doc. 11 at 16-22). She asserts that the ALJ should have adopted the RFC assessment issued by Dr. Dowden on July 19, 2012, which limited Regan to less than sedentary work. (*Id*. at 12-13). However, as the ALJ properly explained, Dr. Dowden's RFC assessment was "completed during the claimant's post-operative recovery process," and thus is not representative of her condition over the longer term. (Tr. 16). *See Thomas v. Astrue*, No. 3:09-CV-71, 2010 WL 546699, at *6 (E.D. Tenn. Feb. 10, 2010) (holding that a functionality assessment produced during the period of recovery following surgery "does not accurately reflect [a] claimant's long-term limitations."). In other words, while it is perfectly sensible that Regan suffered from serious restrictions to her abilities to stand, sit, and move a mere two months after her back surgery, this assessment offers little or no insight into whether Regan would remain disabled for at least one year. Indeed, this conclusion is well supported by D.O. Pasia's assertion that Regan would be off work for approximately six months following her surgery. (Tr. 288, 292, 397). The ALJ thus gave good reasons for discounting Dr. Dowden's RFC assessment.

#### b. **N.P. Esch**

Regan also argues that the ALJ should have adopted N.P. Esch's RFC assessment, drafted on April 22, 2013. (Doc. 11 at 13). However, as the ALJ properly noted, that RFC was drafted nearly a year after Regan's surgery, and despite all indications that her condition had improved, assessed even greater limitations than those found by Dr. Dowden just two months after Regan's surgery. (Tr. 16). The ALJ noted that Regan reported reduced use of pain medication and improved walking ability in the months following her surgery, and no trouble with hip movement. (Tr. 15-16). Regan points to no evidence in the record which would support N.P. Esch's assessment that she could stand for only five minutes without a break, lift only ten pounds, or never stoop. (Tr. 342-43). On the contrary, as noted above, her records show consistent improvement in terms of pain, strength, and mobility, thus N.P. Esch's highly restrictive RFC assessment merited little weight.

### c.    D.O. Pasia

Regan next argues that the ALJ failed to even discuss D.O. Pasia's findings, and particularly his conclusion that Regan would be disabled from work. (Doc. 11 at 20). This is a misreading of the ALJ's decision; while the ALJ does not consider D.O. Pasia's findings by name, he refers to that physician as "claimant's orthopedist," and discusses the major findings from all of Regan's treatment sessions. (Tr. 14-15). The ALJ made specific note of D.O. Pasia's conclusion that Regan would "remain off work for at least six months postoperatively, which would be until November 2012," and that "by October 2012, the claimant was 'walking a lot more' for exercise." (Tr. 14). It thus cannot be said that the ALJ ignored or failed to discuss D.O. Pasia's findings.

27

However, it is true that the ALJ did not assess the amount of weight that should be given to D.O. Pasia's findings. "Social Security regulations require the agency to provide good reasons for the weight given to a treating physician's opinion." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). A "treating physician" is one "who has, or has had, an ongoing treatment relationship with" the claimant. 20 C.F.R. § 404.1502. Regan treated with D.O. Pasia nearly a dozen times between 2011 and 2013, and thus certainly meets this criterion. However, an ALJ is not required to assign weight to every statement made by a treating physician, but only those statements which are "medical opinions." Pursuant to 20 C.F.R. § 404.1527(a)(2), medical opinions are "statements from physicians and psychologists . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." Courts in this circuit have found that a doctor's findings do not constitute a "medical opinion" where the doctor merely diagnoses conditions, but does not evaluate how the patient's conditions impact their type and degree of limitation. *See Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (holding that a physician's opinion as to whether a patient's medically determinable impairments could reasonably be expected to produce the alleged symptoms was not a medical opinion at all, because it did not address the specific extent of the claimant's limitations); *Leidlein v. Comm'r of Soc. Sec.*, No. 14-10718, 2015 WL 1439810, at *8 (E.D. Mich. Mar. 27, 2015) (holding that a doctor's opinion that the claimant suffered from depression, concentration issues, attention problems, and panic attacks did not offer "any specific

limitations that impair Plaintiff's ability to work," and thus did not constitute a medical opinion); *Warren v. Comm'r of Soc. Sec.*, No. 13-15230, 2015 WL 1245936, at *16 (E.D. Mich. Mar. 18, 2015) (noting that the mere diagnosis of a condition does not establish whether that condition produces any functional limitations, and thus may not constitute a medical opinion).

D.O. Pasia's notes can be generally organized into three categories: recording Regan's self-reported symptoms; objective findings and diagnoses regarding her conditions; and statements about the length of time for which Regan would be disabled. For example, in his December 19, 2011, findings, D.O. Pasia notes that Regan complained of low bad mid back pain, with radiation into the left hip, was using Lortab and Motrin for pain relief, and said that Baclofen provided no relief. (Tr. 252-54). A physician's recording of a claimant's self-reported symptoms "is not medical evidence; it is the opposite of objective medical evidence," thus the ALJ was not required to assign weight to D.O. Pasia's findings insofar as they merely regurgitate Regan's complaints. *Alexander v. Comm'r of Soc. Sec.*, No. 13-CV-12434, 2014 WL 4678057, at *8 (E.D. Mich. Sept. 18, 2014) (quotation omitted).

Also on December 19, 2011, D.O. Pasia performed a physical examination, noting tenderness over the midline of the spine, some paravertebral spasms, recorded the degree of flexion and extension of the spine, noted Regan's hand strength, reviewed an x-ray of Regan's spine, and assessed that surgery may be necessary. (Tr. 252). As noted above, a physician's diagnosis, without any attempt to determine how that condition will affect the claimant's ability to perform physical or mental tasks, is not a "medical opinion" as defined by 20 C.F.R.

29

§ 404.1527(a)(2), thus the ALJ was not required to assign any weight to D.O. Pasia's findings on that basis.

On March 27, 2012, and July 24, 2012, D.O. Pasia recorded that Regan would probably be off work for three to six months following her back operation. (Tr. 292, 357). The issue of whether a claimant is disabled is reserved to the Commissioner, thus a doctor's conclusion that a claimant is disabled is not a medical opinion. *Kidd v. Comm'r of Soc. Sec.*, 283 F. App'x 336, 340 (6th Cir. 2008). At no point in Regan's numerous treatment sessions with D.O. Pasia does that physician record that her diagnosed impairments limited her ability to lift, walk, sit, stand, crouch, crawl, or perform any other activity, much less provide information as to the degree of limitation. D.O. Pasia's findings are thus not "medical opinions" under 20 C.F.R. § 404.1527(a)(2), and the ALJ was not obligated to consider the weight he gave to those findings.

This is not to discount the value of D.O. Pasia's findings. Indeed, because of the frequency of Regan's treating relationship with D.O. Pasia, the notes created during those appointments provide some of the best evidence for evaluating Regan's condition throughout her recovery process. While these notes do not contain assessments of how Regan's ailments impact her limitations, the ALJ properly referenced Regan's self-reported reduction in pain, and increase in strength and mobility, along with D.O. Pasia's findings of decreased spasms and the elimination of pain upon palpation of the spine. (Tr. 15). The ALJ thus did not commit reversible error by failing to discuss the weight he assigned to D.O. Pasia's findings, and

properly referenced those findings insofar as they offer insight into Regan's recovery process following surgery.

### d.    DDS Non-Medical Analyst Skavdahl

Regan also protests that the ALJ's decision did not reference the findings of DDS non-medical analyst Skavdahl, who found that no medical evidence refuted Dr. Dowden's RFC assessment. (Doc. 11 at 18). ALJs are obligated to "consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence" 20 C.F.R. §404.1527(e)(1)(iii). Skavdahl is a non-medical analyst, and Regan cites no statutory or case law authority for the proposition that an ALJ must discuss a non-medical DDS analyst's opinion. Further, Skavdahl's opinion is tempered by the findings of Dr. Stevens, a medical specialist DDS consultant, who found that the objective evidence supported a finding that Regan could perform sedentary work, and that her condition had improved following her spine operation. (Tr. 337). The ALJ was thus not required to discuss Skavdahl's findings.

### 4.    *The ALJ Properly Supported His Credibility Findings*

Finally, Regan argues that the ALJ improperly assailed her credibility. (Doc. 11 at 22-26). Specifically, Regan asserts that the ALJ failed to apply the Sixth Circuit's seven-factor test for evaluating pain, and by rendering a "fundamentally flawed" credibility finding. (*Id.*). This circuit has consistently held that the seven factors for evaluating pain set forth in *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) must be merely considered by the ALJ, and need not be specifically discussed in the ALJ's decision. *See Bowman v. Chater*, 132 F.3d 32 (table),

31

1997 WL 764419, at *4 (6th Cir.1997); *Burbo v. Comm'r of Soc. Sec.*, 877 F. Supp. 2d 526, 541 (E.D. Mich. 2012); *Adams v. Comm'r of Soc. Sec.*, No. CIV.A. 11-14558, 2012 WL 6931495, at *12 (E.D. Mich. Nov. 6, 2012) report and recommendation adopted, No. 11-14558, 2013 WL 300907 (E.D. Mich. Jan. 25, 2013).

Issues of credibility are generally left to the sound discretion of the ALJ; an ALJ's credibility determination may only be disturbed for "compelling reason." *Sims*, No. 09-5773, 2011 WL 180789, at *4. The ALJ may discount a claimant's credibility if he or she "finds contradictions among the medical records, claimant's testimony, and other evidence." *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997). The ALJ is required to provide nothing more than a reasonable justification for their credibility finding which is supported by substantial evidence. *See Drake v. Comm'r of Soc. Sec.*, No. 1:13-CV-230, 2014 WL 4983839, at *3 (W.D. Mich. Sept. 24, 2014). The ALJ noted Regan's assertion at the hearing that she needed to elevate her legs six to seven times daily, despite a total lack of evidence in the medical record indicating that she even discussed that limitation with her physicians.[2] (Tr. 15). He further noted that Regan's assertion of disabling pain, rating between a six and ten out of ten depending on the day (Tr. 35), was contradicted by records that she was taking pain medication only intermittently, and felt well enough to walk for exercise (Tr. 15). The ALJ also generally questioned the veracity of Regan's asserted limitations following her one-year recovery process from her spine surgery. (Tr. 15). Dr. Dowden found that, just two

---

[2] Further, Regan's asserted need to elevate her legs is directly contradicted by N.P. Esch's April 2013 findings. (Tr. 342). While the ALJ did not specifically note this contradiction, it serves to further support the ALJ's conclusion that Regan's asserted need to elevate her legs is inconsistent with the objective evidence.

months after her surgery, while still recovering, that Regan could lift ten pounds frequently (Tr. 327), and in April 2013, nearly one year after surgery, N.P. Esch again found that Regan could lift ten pounds (Tr. 342). Thus, Regan's assertion in the May 2013 hearing that she had not attempted to lift ten pounds and would probably be unable to frequently lift a gallon of milk (weighing about 8.6) strains credulity. (Tr. 41).

Finally, the ALJ makes special note of records that Regan told physicians she was "doing okay" and "walking more" in the months following her surgery. (Tr. 15-16). While these vague statements would perhaps be insufficient to justify the ALJ's decision on their own, when read in the context of Regan's most recent medical records, which contain no indication of disabling symptoms, it is clear that the severity of Regan's conditions do not comport with her asserted degree of limitation. The ALJ's credibility findings are thus supported by substantial evidence, and should not be disturbed.

The ALJ thus properly rendered his RFC assessment, and that assessment is supported by substantial evidence in the record. The ALJ properly considered the opinions and findings of all physicians in the record. Finally, the ALJ's credibility finding is supported by substantial evidence.

### H.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Regan's Motion for Summary Judgment (Doc. 11) be **DENIED**, the Commissioner's Motion (Doc. 15) be **GRANTED**, and that this case be **AFFIRMED**.

### III.    <u>REVIEW</u>

33

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

34

Date: November 17, 2015                    S/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge


## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: November 17, 2015                    By s/Kristen Krawczyk
                                           Case Manager to Magistrate Judge Morris

35